Next case is in re Marriage of Fitzgerald and for the appellant we have Mr. Wilson and for the appellee Ms. Wong and Ms. Druzycki. Did I pronounce that halfway correctly? Halfway, yes, your honor. Okay, thank you. Druzycki. Okay, you may proceed. Thank you, your honor. Court, please counsel. I represent Tony Fitzgerald who was the movement in this matter. Mr. Fitzgerald was employed at the time of the marriage with the University of Illinois. He had been there for a number of years and essentially the period of marriage during which he was employed was about 10 to 11 years. The matter arises because of a question about the appropriate disposition of his state university retirement system funds. The starting point is dealing with the quote rows and under the pension plan, of course, a quote row is established only for the purpose of not establishing wife's share of the pension in this case, but rather to implement, to enforce what the trial court has already ordered. I think that's pretty clearly set forth in 40 ILCS, the pension code, 5-1-119. The pension code itself makes reference to the appropriate disposition being awarded by the trial court pursuant to section 503, which is the provision of the pension. Then we get to the point where we're talking about modifications pursuant to section 510B. The difficulty we have with that, and it applies to this case, is that any modification of a property disposition pursuant to section 503 must be made within 30 days of the entry of the judgment, unless there's some suggestion that there's fraud involved in the procurement of the judgment or the like, 1401 or 1402 most. Those did not present in this matter. So what we have is we've got these folks who were married for about 10 years, and because of that, Mrs. Fitzgerald was entitled to a portion of the pension. The question then becomes, what portion? The parties reached an agreement, and the judgment of dissolution of marriage was entered in 2002. Thereafter, in 2003, the parties agreed on a marital settlement agreement, and therein lies the rub, because the agreement of the parties was basically that Mrs. Fitzgerald was going to receive a deed to the house, marital residence, and the parties agreed that Mr. Fitzgerald's share of that was $25,000. He deeded that to her. The judgment itself reflected that her share of his pension was going to be reduced by that $25,000. The parties finally agreed that after that reduction, the amount she would actually receive was $16,337.28, to the penny. There's a lot of suggestion in the pleadings in this court by counsel that this was an estimate, to the penny. So I think that the question then becomes is, can anyone dispute that figure? I think the answer under Keiko is no. Even the trial court could dispute that figure, because that was the agreement by the parties. And for that reason, I think it's pretty clear that that is the figure. Now, what happened after that? The parties entered into a quildreau. Unfortunately, at that point, Mr. Fitzgerald had not retired. He didn't retire until February of 2009. So there was about a six-year hiatus there before there was any return on the retirement income. So there was a quildreau, and it was not a pretty quildreau. Since he hadn't retired, nobody knew what the real figures were that would go into that. But nonetheless, it did have a couple of important things in it. And that is, it set forth that figure of $16,000 in the quildreau, as well as in the judgment of dissolution of marriage, marital settlement. That's what quildreau, the pension code says, directs the state university retirement system. So the other thing on the second page of that quildreau is that – I actually made it on the first page – that there would be no additional amounts awarded. And our position is, that means interest. The document itself talks about no cost of living increases, no annual increases. And for that reason, it is our position that that $16,337.20 figure is the final figure. Now, the trial court had some difficulty with that, because the marital settlement agreement said that as of August 7, 2003, the actual amount to be awarded is – and they cited that $16,337.20 figure. So the question then becomes is, well, should that have bothered the trial court? Our feeling is no. It was carved and granted by agreement of the parties. There was no provision in the quildreau for the accrual of cost of living increases, annual increases, or interest. So we go along the road, and suddenly then he retires in February 2009. Well, he retired then, but we didn't manage to get back to court to send any definite figures until I believe it was June 8 of 2009. And at that point, we had a different counsel for Mrs. Fitzgerald, Ms. Wong, and I remained in the case on behalf of Mr. Fitzgerald. We reached an agreement and presented that to the court and agreed – There were a number of things coming down as the record reflects. Mrs. Fitzgerald had a falling out with the kids and the kids were forced to leave. They came home to Mr. Fitzgerald, so we had to do some shifting on child support, good things like that, visitation if you would. And we also entered into a Wisniewski type of arrangement for Ms. Fitzgerald to get part of her retirement funds coming from Mr. Fitzgerald. Now at that point, since he had retired in February and we're talking about June now, he had an arrearage to make up, and that was figured to be approximately $7,000. He received some credits for child support and the like and ended up paying a lump sum of about $4,100 and some odd dollars. That was basically out of his pension that he had received after retirement that Mrs. Fitzgerald had not gotten at that point. The problem arose in part because of the figure that was agreed upon between the parties at that point, and that is slightly over $1,000 a month that she was receiving. I think that's gone up to about $1,100 right now. But in any event, she received those funds and the form, the new bill, and we learned this from one of the public court divisions in Liz's cult decision, indicated that we had Wisniewski and Hunt come down and say, we want Hunt-Wisniewski type decisions where you get one-half of the retirement they earned during marriage. That's where we started from. But it was then and still is Mr. Fitzgerald's position that that is applying against that $16,000 figure, and it was the amount that Mrs. Fitzgerald had actually received. Is that what the Quilgrove says? The Quilgrove, no. I mean, I'm looking at it. You were his counsel at the time. Both parties initialed it. Actually, they initialed a change, but the alternate payee is to receive $1,056.34 a month. That's what she started at. That was the amount that we started paying her. It did not mention being accredited against the $16,000 figure. And that was recognized by Judge McPeters at a later hearing. And as reflected in Volume 5 of the record, on pages 38 to 40, where Judge McPeters basically recognized that with a Quilgrove, you don't put in all the language. And if the court looks at the first Quilgrove, the second page says, don't change the language. If you alter our form, it will invalidate the Quilgrove. So we're dealing with an administrator of a, if you will, quadro, or Quilgrove in this case, where they make the rules and they call the shots. And you try to comply with what their direction is. But when you look at that first Quilgrove, back in 2003 or whenever it was, yeah, 2003, that figure of $16,377 was her share, the way I'm reading this, if he took his refund out or took a lump sum. That would get paid to her, as opposed to a monthly pension amount that he would take. That's correct, because we didn't know what his pension was going to be. He had another six years before he retired. But making reference to the Judgment of Dissolution of Marriage, which is, that's the formative document. That doesn't say an exact monthly payment, because it can't get in no way the same amount. But what it did do is it says, this is the finite amount, despite what is in the Quilgrove. What it says is, of any member's refund, payable by termination, or lump sum retirement benefit that becomes payable, she gets $16,377 when any refund or lump sum retirement benefit is paid. That's what the Quilgrove says, Your Honor. Right. But he didn't get a refund or a lump sum retirement. He did not. He started collecting monthly payments in February of 2009. So what happened is, the council got together and figured out what her percentage would be. There was an agreement upon that. But did we go ahead and start putting attachments on the Quilgrove? No, not with CSRS. And the reason for that is, they don't want the paperwork, and all they're doing is implementing. They're not the court that actually decides these things. And I think that's what the pension code talks about, because it talks about an agreement, and the agreement makes specific reference to the marital settlement agreement, or the court judgment of dissolution of marriage. Well, the $16,000 figure represented a percentage, I presume a 50% percentage, of the period of time during the marriage. The pension monies paid into the CSRS totaled X, half of X, turned out to be $16,000 and change, plus the $25,000 that we traded for the house. That's correct. That was the agreement of the parties that basically was a contract. But that doesn't really reflect or have an impact on how the Quilgrove actually works, does it? How it's implemented? Well, if you pay into a pension, and your benefit is not capped, your total benefit is not capped at what you paid in, correct? Ordinarily, it depends on what the plan would be, I guess, but I don't want to split hairs. I mean, I paid into the judicial retirement system for 20 years, and for that, I get a pension whenever I decide to retire. All right? The amount of money I will get if I live long enough is going to be more than I've paid in, because they invest the pension funds to grow the money to provide the monthly benefit, right? Yes, sir. So, if the $16,000 figure is the gross amount, less the $25,000 that was credited back to the husband, that just establishes the ratio or the percentage of the total pension monthly benefit. It doesn't cap the receipt of the $1,600 or whatever it was, the monthly pension amount that the former Mrs. Fitzgerald gets, right? I respectfully disagree. Okay, tell me how. I think the law is pretty clear, based upon Keyhoe, that if you get a contract, and that's what an MSA is, a marital, I'm sorry, a marital settlement agreement. If you get a contract, the court may not, according to the law as I read it, start readjusting. Well, the court already did it when it entered the quildro, at the same time the judgment order was in. No, sir. It entered the quildro based upon the agreement of the parties, not upon any independent judicial determination. And I think that that's pretty clearly the law. Well, I see Judge Peters signed the quildro June 8, 2009. He did. He is a judge. Very much so. He said in his order, the quildro order, that of your client's total pension, she gets $1,056.34 per month, right? At that point, yes. Well, at what point did it stop? Well, it increased. While this has been dragging its feet through the courts, it's increased by 11%. At what point does it stop? That's why we're here. Is it anywhere in this order say that it stops? The quildro, no. The judgment of dissolution, yes. The marital settlement agreement, yes. And it stops when you peak out at that 16 plus. Plus, she got the house. Well, she gave up $25,000 for that. And that's the distinguishing factor between Hunt and Wisniewski and some of these other cases I've cited in the brief, and that is that there's a value to that. And the parties agreed upon a value. And now, Mr. Fitzgerald wants to keep milking that cow until it drops over. And Mr. Fitzgerald's tired of the cow getting milked. I see my time's just about up, Your Honor. Well, you'll have some additional time on rebuttal. Pardon me? You'll have additional time on rebuttal. Thank you. Ms. Wong. Good afternoon, Your Honor. I'm Betsy Wong. I am with Lane & Wisniewski, represent the former wife of Mr. Fitzgerald, Brenda Fitzgerald. Let's first straighten up some of the facts here. The parties' judgment of dissolution of marriage was entered in 2002. In 2003, August of 2003, they entered a marital settlement agreement, and that was approved, the Order on Ancillary Issues. In 2007, Mr. Fitzgerald filed a pleading saying that he was now retired and that there was need for a new quildro to be entered. In the interim years, the legislature had caught up with the court decisions and asked a new quildro form to be used. Two years later, not four months later, two years later in 2009, the parties, by agreement, submitted, using the new quildro form, a new quildro. That quildro form provided, and it's in the file, that she started out with a monthly 1,000-some benefit. And that continued and did not terminate until upon the death of either the participant, Mr. Fitzgerald, or the alternate payee, Mrs. Fitzgerald. That then continued until late 2010. December 2010, Mr. Fitzgerald returns to court asking the court to terminate the agreed order, the agreed quildro order that had been submitted in 2009. And that is why we are here, because he's still trying to terminate the agreed quildro order that was entered in 2009. I'm quite puzzled why an order that he thought was appropriate and that he said was agreeable, and that he joined Mrs. Fitzgerald in tendering to the court for entry in 2009, is no longer appropriate, no longer consistent with the Americal Settlement Agreement. But that is our issue that we are here today on. Now, in his initial brief, he complained about Judge Blockman's denial of his motion for summary judgment. But since he did not say anything about that in his reply brief, or say anything about that today, I'll move on. I think we've got just two points remaining. The next point is whether Judge Blockman erred in denying his, I think it was his second amended petition, to terminate the 2009 agreed quildro order. And as I have argued in my brief, and I'm arguing today, the judge was very proper in his analysis. It's a de novo analysis by you all. And the question is whether the Marital Settlement Agreement of the parties is ambiguous or not as to how the retirement is to be divided. Now, this is a contract. Use contract analysis to look at the entire agreement. What have we got here? We've got a typical marital settlement agreement. What do we have here? We have a typical middle class family. They have two cars, two car debts, one house, one retirement, two kids, that's all they have. So what did they do? The intent is pretty clear. They were dividing things down the middle. Each of them took one motor vehicle with the debt. The custody was decided, not an issue at this point in time. They each took the financial accounts in their names. I wasn't counsel, so I don't know if there was much of anything in that. And as to his retirement, they said she's entitled to a share. Then they went on to decide that she's entitled to one half of the marital portion. Does this sound familiar? It's very typical. Now, they did not have enough funds apparently because she received the title to the marital home. And instead of him getting offsetting property award some cash or something for that one half interest of $25,000, that was handled in the retirement paragraph as he will get a credit against her one half share of his retirement interest. Now why I'm spending a little bit of time on this was you can see throughout the brief there's an issue as to whether or not Mr. Fitzgerald ever received that $25,000. And I encourage you to look at the exhibit folder because it has in there, Judge Blackman said I'm tired of this going back and forth about who received what from CSRS. I want you to both show up with a printout from CSRS of all that each of your clients have received. And so we showed up and that was stipulated into evidence at that March hearing on his Second Amended Motion to Terminate Quill Room. And it shows that from February 2007 through summer of 2009 Mr. Fitzgerald received his total CSRS payment. And then in I believe August 2009 it shows the $1,000 payment being subtracted from his benefit and being paid to hers. And the calculation that he received the $25,000 is those two years worth of payments that he had received, all of it, which was about $1,000 a month. So that's how he received his $25,000. How did the state of Illinois know to do that? No, they didn't know to do that. How did CSRS know? No, this was a calculation we did in 2009. She's asking where the money came from if it didn't come to CSRS. How did he get the full amount of his pension? Because he got the full CSRS benefit from February 2007. But why? Just mechanically. There was no quill row in effect that deducted anything for her share. And your view would be your client knew that, that was okay with her, that was how she was repaying the $25,000. Right. He filed in 2007 the motion for the new quill row saying I have retired. And then we wait until 2009 for the entry of the new quill row. Are we clear? So CSRS wasn't part of it. It was put into it. The subtraction for her, the division of his retirement check, the monthly check, didn't start until two years after retirement, about two and a half years. So anyway, the issue that Blockman had to address was whether there is ambiguity in what the parties intended, and whether the 2009 quill row should be terminated or not. And the analysis was the appropriate one. He looked at the entire agreement, noted this is basically dividing 50-50, and then he looked at Section 2.5, which is the section where we specifically talk about the retirement interest. And in Section 2.5 we've got a number of sentences. Mr. Fitzgerald's entire argument since 2010 has been on the fourth or fifth sentence of that paragraph. But you always have to read a document in total. So first sentence, wives shall have a share in husband's pension. Second sentence, wives' share shall be one-half of the husband's pension with CSRS. Okay, the one-half, now we have the percentage for the coverture formula stated. Going on, acquired from the date of the marriage, January 25, 1992, through July 15, 2003. We have the number of months that we use for the numerator in the coverture formula. And of course the denominator will be determined when he retires so we know how many years of total service that he has. But we have the percentage, 50%, and we have the number of months for the numerator set forth in Section 2.5. Wives' share of the retirement sum shall be reduced by $25,000, which reflects husband's interest in the formal marital residence, which he shall put plain to wife. And that was satisfied by him getting his entire check that first 20-some months from February of 2007 through July of 2009. Wives' share of those retirement funds with CSRS shall be awarded in an Illinois Qualified Domestic Relations order. And then the one sentence that he's relying on, and it doesn't say that it contradicts or changes any of these prior sentences, the parties agree that as of August 7, 2003. Now if all she was ever entitled to receive ever, ever, ever was the $16,000, you wouldn't need that qualifier date. You wouldn't need it. So there was an agreement as of August 7, 2003, the actual amount to be awarded is $16,33728. That was put in the 2003 QUILDRO, and as one of you observed, that was against his lump sum, if he ever got a lump sum. As Judge Blockman observed, most people are smart enough not to take that lump sum upon retirement. So anyway, this 2003 QUILDRO never executed, I guess would be the word you would say, because he never took a lump sum retirement. His attorney, recognizing that this one was not appropriate, not applicable, in 2007 after his client retired, gave notice, you know, it's time to get a new QUILDRO implemented. And that is what the parties did. The court found that the language of the marital settlement agreement was a Wisniewski type of arrangement, and I think it very much is by specifying the percentage, specifying the period of time that you use to calculate the months for the numerator of the curvature formula. It was not completed until after he retired. He did retire, the formula was completed, the 2009 QUILDRO was entered. So the judge denied the motion to, second amended, petition to terminate the 2009 QUILDRO, finding, hey, you intended the Wisniewski arrangement, because what Mr. Fitzgerald's problem with this 2009 QUILDRO, if you look at it, he didn't have any problem with getting $1,000 for some months. His problem is in paragraph 3D, where it says, payments to the alternate payee under this section shall terminate upon the death of the member or the death of the alternate payee. That's, you know, all the way out. That's how Wisniewski works. It's all the way out. That's where his particular problem is. But if you look back at the marital settlement agreement in 2.5, there's no language in there that says, and the payments figured out by this formula set forth in the first sentences of the agreement, shall terminate after he gets, after she gets, in some distant future year, a total of $16,000. So I think that the judge's analysis of the trial court was appropriate. I think that this is a straightforward marital settlement agreement. It's not ambiguous. If something is inartfully drafted, is it ambiguous? Is that a way of saying it could have been done better, but I know what it means? Well, the question is whether it's clear or not. Whether it's ambiguous. So it can be clear, but inartfully drafted. And I think it's the as of August 7, 2003, that limits that sentence. And that sentence really didn't even really need to be there, except for the weird, not weird, the inadequate form of the quildro at that point in our history in Illinois. We had the Wisniewski approach. We had the Kovacher formula approach. But we didn't have a means of setting that forth in that initial quildro form. And it just took the legislature a few years to catch up. The members of the legislature never having practiced family law. Well, we continue to be burdened with that issue. Well, we won't go there. And probably the bar should have gotten on them sooner and said, hey, we have a problem here. Because it was darned if you do, darned if you don't. Because there was put the dollar amount in, or put the amount from the refund in, but there was no place in that original form for the percentage approach. So when you did a quildro, it put a flag on the CSRS account. And so if Mr. Fitzgerald had quit, run over to CSRS and tried to get a lump sum refund, and then go to Ireland or wherever, it would have flagged it. And she would have had notice of it before anything was done. But that never came to pass. He took the monthly annuity. And so her share is the one half share, except for that $25,000 that with her concurrence he received in those first initial years. You know, if he was right, if all she was awarded, all she was entitled to was $16,000, why didn't she get the first four payments? His first four payments were each over $4,000 from CSRS. His first four monthly payments. And then he would have been done with her. But that's not how he let it ride out either. But that's beside the point. The point is whether this is ambiguous or not. Trial court found it wasn't. And then does the 2009 comply with it? Trial court found it did. End of case. Now, I did put on file a motion for contribution of attorney's fees. Because this matter has been going on since 2010 on this issue. My client, she remarried. She has two younger children in the home. She has her $1,000 some dollars from CSRS. She has a $620 SSI payment for her young son. And she sometimes gets child support. Whereas he's got over almost $5,000 a month. So I thought the financial circumstances warranted an award of contribution towards her attorney's fees for this matter. Thank you very much. I see my time's up. Thank you. Rebuttal. If there was some error in drafting, please bear in mind, it wasn't Mr. Fitzgerald's drafting. It was Ms. Fitzgerald's drafting. So if there's an ambiguity, we all know against whom it's most wrongly construed. Now, she drafted the Merrill Settlement Agreement? And her attorney did? Mary Ann Midden was her attorney at that time. How about the Quilgrove? Who drafted that? She did. You're quiet initially. Yes. You're required to initiate a Quilgrove and consent. Well, but if it was wrong, it was wrong then. We didn't say it was wrong. We believe, and still believe, it says exactly what the agreement of the parties was. And in 2009, Ms. Wong was there, and if she thought it was wrong, why didn't she bring it up then? If she thought there needed to be a modification to reflect some sort of notation, why didn't she bring it up? Instead, she agreed to the stipulation in order that said, among other things, in order to implement the Quilgrove, we're going to make up all of the time from the 1st of 2009. If there was an allegation that there was some shortage at that point,  no, and admittedly, that's not of the record, but I've sat here listening to a lot of things being stated to this court that are not of record. What shortage was there? You mean you're still disputing whether you got the $25,000? Well, how the hell did you get it? Well, isn't that her paying it, in effect? Well, what does that have to do with... I mean, that isn't even in dispute, and it's not outside the record, is it? If it was litigated below, and it's been decided, and you're not here appealing it, are you asking for that, too? No, no, what I'm saying is, all he owes is $16,000. And he's paid, according to the records, at this point, probably over $40,000. Because with the wheels of justice cranking so ever slowly, certainly in Champaign County, we've been, as Wong suggested, two years hidden here. In any event, if there are ambiguities, I think they should be visited upon the Misfits' Jail. And I apologize, I won't say more, because time's up.